## In re NAJOUR.

(District Court, N. D. Georgia. September 25, 1917.)

No. 5776.

1. BANKRUPTCY ☞399(1)—HOMESTEAD EXEMPTION—CHANGE OF FINANCIAL CONDITION.

    The mere fact that the bankrupt's financial condition, as shown by a statement made 14 months before bankruptcy for the purpose of obtaining credit, greatly changed during that period, will not alone warrant denial of a homestead exemption.

2. BANKRUPTCY ☞228—REFEREE—DETERMINATION.

    The decision of a referee, based on a hearing where witnesses were personally examined by him, should not be interfered with unless clearly wrong.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. BANKRUPTCY ⟨⟩399(1)—EXEMPTIONS—HOMESTEAD—FORFEITURE.

    A bankrupt should not be denied his homestead exemption, because of his transfer of his homestead to another person, where it was retransferred to him, and the transfer was not made with intent to prefer creditors.

In Bankruptcy. In the matter of the bankruptcy of Costa G. Najour. Application by the bankrupt for the setting aside of a homestead exemption, to which John Silvey & Co. and other creditors filed objections. Objections overruled by the referee, and the creditors petition to review. Petition denied, and referee's report confirmed.

Dorsy, Shelton & Dorsey, of Atlanta, Ga., for objecting creditors.
McCallum & Sims, of Atlanta, Ga., for bankrupt.

NEWMAN, District Judge. This is an application for homestead exemption by the bankrupt, Costa G. Najour, and $920, a part of the amount realized from the sale of the bankrupt's merchandise, was set apart by the trustee to the bankrupt as an exemption. This was referred to N. L. Hutchins, referee, for determination, and his report and opinion on the subject is as follows:

"On April 11, 1917, the trustee, R. C. Patterson, filed his report setting apart the bankrupt's exemption to the amount of $920, same being cash derived from the sale of stock and fixtures of the bankrupt. On April 14, 1917, John Silvey & Co. and others filed objections.

"The first ground of objection insisted upon was because said bankrupt, in January, 1916, made a written statement to R. G. Dun & Co., for the purpose of obtaining credit, in which he represented at that time that his assets were $11,500 and his total liabilities $4,000, showing a surplus of assets over liabilities in 1916 of $7,500. Fourteen months later, when he admitted in writing his willingness to be adjudicated a bankrupt upon the filing of an involuntary petition against him, he scheduled liabilities of approximately $10,000, and his only live asset was a stock of goods and fixtures which inventoried approximately $4,000; that the only other assets scheduled were accounts receivable for goods sold, having a face value of approximately $6,500, whereas, in truth and in fact his ledger and books showed that he had at the time of bankruptcy accounts receivable of only $5,400, and that these are all practically worthless. There therefore has been a shrinkage of assets in 14 months from a solvent condition of $7,500 to an insolvent condition of approximately $7,500, or showing a shrinkage in assets in 14 months of approximately $15,000.

"The second ground of objection insisted upon by objecting creditors was that in November, 1916, the bankrupt purchased the property where he lives at 417 East Fair street, paying with his own check the sum of $500 cash payment thereon; that shortly thereafter he transferred said property to his wife for love and affection, and that at that time the bankrupt was totally and wholly insolvent; and that said transfer was fraudulent, and made for the purpose of hindering, delaying, and defrauding his creditors, and amounts to a concealment of his property, and for that reason the bankrupt is not entitled to his homestead exemption.

"Third. That creditors' further objection is because during the three months immediately preceding said bankruptcy, to wit, in December, 1916, and January and February, 1917, the bankrupt purchased and received in his store approximately $7,000 in new merchandise; that during the period of three months immediately preceding bankruptcy said bankrupt sold or otherwise disposed of approximately $10,000 worth of merchandise; and that he has made no satisfactory explanation of what has become of said merchandise or the proceeds thereof.

"Fourth. That during the three-months period aforesaid his books showed that he turned over a large portion of merchandise to friendly Syrian peddlers, and he admits that some of it was practically at cost, and if he received the cash he has not satisfactorily accounted for it, and he turned over to a friendly Syrian peddler $600 in new merchandise as credit on an alleged loan, which he admits having been owing by him for over a year, and that the delivery of said merchandise amounted to a transfer of his property for the purpose of hindering, delaying, and defrauding his creditors; that during the month of February, 1917, preceding bankruptcy, he paid bona fide merchandise creditors the sum of $138.33, while during said month he paid to relatives and friends the sum of $1,553.75, and that the payment to friends and relatives was on alleged loans of long standing; that the bankrupt on the one hand was purchasing from the objecting creditors new merchandise, and with the other hand concealing said merchandise, or else selling it to his friends and relatives, all the while in contemplation of bankruptcy proceedings, for the purpose of defrauding his bona fide merchandise creditors.

"Fifth. Said objecting creditors further insist that, although the report of the trustee setting apart the homestead exemption was not filed until April 11, 1917, said bankrupt undertook on April 5, 1917, to transfer, sell, and convey all of his right, title, and interest in the homestead to be set apart to him to another, with instructions to the trustee to pay over to said party any amount which might be allowed him as a homestead exemption.

"The above matter came on for hearing before the referee under special reference on May 14, 1917, at Atlanta, Ga., in the Federal Building, beginning at 9 o'clock a. m. and being concluded at 3:30 p. m. of the same date. A lengthy investigation was then had, and many witnesses were sworn and testified. It appears that Costa G. Najour, the bankrupt, was a Syrian merchant on Decatur street, in the city of Atlanta, Ga.; that his business consisted of selling, principally at wholesale, supplies to Syrian peddlers. These peddlers seem to have been his principal customers. On January 13, 1916, the bankrupt made a statement to R. G. Dun & Co., in which it appears that he had on hand at that time merchandise to the value of $7,000, outstanding accounts at a realizable value $3,400, and cash in bank $900, fixtures, furniture, etc., $200, making a total of $11,500; that at that time his liabilities amounted to $4,000; that he owed his merchandise creditors on open account $2,400, he owed the bank for loans $500, and he owed friends and relatives $1,100, making his surplus $7,500 at that date.

"It appears from the testimony, from an examination of bankrupt's books, journals, and ledger, his passbook at the bank, paid checks, etc., goods bought, good sold, etc., that, starting with a stock of goods in January, 1916, at a value, as shown by his books, of $6,711.67, and accounts receivable at substantially $3,500, between that time and the 1st of March, 1917, the bankrupt had purchased in his business goods to the amount of $22,355.26, making a total amount of goods handled from January 13, 1916, to bankruptcy, of a little over $29,000; that a careful inventory made by the receiver, after bankruptcy, showed on hand stock of goods of the value of $3,172.97. It appears that during said period of a little over a year that the bankrupt, as shown by his checks, had paid to his merchandise creditors, as far as can be ascertained, the sum of $25,954.77. The best information obtainable from the evidence shows the bankrupt's current expenses at his store amounted to around $1,800 a year; that he paid out, in addition to amounts shown by his checks, for merchandise for which he paid cash, amounting to about $1,800; that he paid certain debts owing to friends with goods out of the store, about $700, to say nothing of his living expenses, which cannot be determined from the evidence. It therefore appears that during the year preceding bankruptcy the bankrupt had handled practically $25,000 worth of goods, and has paid out during the same period, in connection with his business, practically the sum of $30,000. At the time of bankruptcy, therefore, with stock of goods inventorying $3,172.97, fixtures $840.00, accounts receivable, actual, $5,481.63, making his assets about $9,494.60; from his list of creditors, and claims proven, it appears that at the time of bankruptcy he owed merchandise creditors $9,433.98. While it is true that bankrupt appeared to have received an unusual amount

of goods during the early part of 1917, his explanation was to the effect that while he had purchased most of those goods several months previous, for delivery in October and November, 1916, the mills from whom he purchased delayed deliveries until January, 1917; that his stock of goods had been reduced down to about $2,000 to $2,400, during the month of December, 1916; that his customers, being principally peddlers, then came in for their spring supplies; that shortly thereafter it began raining and rained for a long period, thereby preventing peddlers from going out on the road and selling the goods purchased from him, and they being unable to pay for them before bankruptcy, placed him in such position that he could not collect and therefore could not pay his general creditors; that his business had fallen off quite materially during the year 1916, on account of business conditions on Decatur street. From a careful review and examination of all the books, papers, etc., connected with the testimony taken at the hearing, I fail to find the evidence of such fraud as is contemplated by the statute sufficient to deprive the bankrupt of his exemption in connection with objection 1 of objecting creditors.

"Concerning the second objection, as insisted upon by creditors, the evidence furnishes what would seem to be the truth of the transaction in reference to the purchase of property at 417 East Fair street, from the bankrupt, his wife, the real estate dealer, and others, showing to the court that the money thus paid out was the separate property of his wife, and was not paid out of funds derived from his business.

"Objection numbered 3 is disposed of in what has been said in connection with objection 1.

"In connection with objection numbered 4, the bankrupt appears to have made a satisfactory explanation of the goods turned over to a friendly Syrian creditor of $600 in new merchandise, on what appeared to be a bona fide loan made by a friendly Syrian to the bankrupt, and did not amount to a transfer for the purpose of hindering, delaying, and defrauding his creditors. While it appears that during the month of February, 1917, the bankrupt paid to his Gentile merchant creditors only the sum of $138.33, and that during said month he paid relatives and friends the sum of $1,553.75, or thereabouts, and that the same were made in payment of loans of several months standing, yet it appears from the testimony of the bankrupt, checks exhibited, bank books, etc., in connection with the testimony of friends to whom moneys were paid, that said sum of $1,500, or about that amount paid to friends and relatives, was for money previously borrowed which he had used in paying on his indebtedness to his general creditors; that $300 of this $1,500 was money held at the request of a Syrian preacher, who was making charitable collections along from time to time, and that amount was paid after the Christmas holidays when called for by said preacher. The referee is of the opinion that this ground is insufficient to deprive the bankrupt of his right to exemption.

"In connection with objection numbered 5, whatever may have been bankrupt's intention in making transfer of his homestead, he has since obtained a transfer of the same back to himself. This condition seems to have been reported since the hearing to the District Judge, and by said judge ordered filed and to become a part of the record in this proceeding. So the referee is of the opinion that this ground is insufficient to deprive the bankrupt of his right to exemption.

### "Conclusion.

"The referee, therefore, from books, papers, records, two examinations of the bankrupt, both at the first meeting of creditors and the hearing before this referee, and the briefs and arguments of counsel, is unable to determine that the debtor has been guilty of such 'willful fraud in the concealment of a part of his property from his creditors of which he is possessed when he seeks the benefit of exemption,' or failed to make that full and fair disclosure as would be sufficient to deprive him of his claim to exemption. So, having arrived at this conclusion, it appears that the trustee's report of exempted property should be confirmed and the bankrupt's right to exemption claimed determined accordingly."

[1] The petition to review the action of the referee and the argument before me were directed mainly to what is shown here as to the bankrupt's statement, early in 1916, to R. G. Dun & Co., of considerable assets and small liabilities and the fact that when put into bankruptcy, in 1917, about 14 months after this statement, his indebtedness was large and his assets small; and the cases of In re Dobbs (D. C.) 172 Fed. 682, and (D. C.) 175 Fed. 319, were cited as authority. The decision in the Dobbs Case speaks for itself, and I was satisfied in that case that the evidence did not sufficiently account for the discrepancy in the assets from the one period to another. In this case the referee says:

"The referee, therefore, from books, papers, records, and examinations of the bankrupt, finds," etc.

Thus it shows that the referee had before him the books and papers of the bankrupt, from which he was able to ascertain that there had been no such willful fraud in his business and as against creditors as would defeat his exemption. In the Dobbs Case I said, speaking of the bankrupt:

"He appears to have kept no satisfactory books of account from which the facts as to what he had done with his property and how there had been such a remarkable change in his business could be ascertained."

In the present case the referee finds a different situation and that the showing made by the bankrupt is satisfactory, and thinks it satisfactorily shows that he made a full and fair disclosure of his property when he claims his homestead exemption.

[2] The decision of a master or referee, based on a hearing like this, should not be interfered with unless it is clearly and manifestly erroneous, and another rule that is applicable here, and to which I have always adhered, is that where a referee or master hears the witnesses in person, sees them examined and cross-examined, and notes their bearing and manner, he is better able to judge whether they should be believed or not than one who takes such testimony on paper, as I have to do here; that is to say, the general rule is that one who sees the witnesses and hears them is better able to judge of their credibility than one who reviews their testimony as it appears only after having been reduced to writing.

[3] There is another objection to the allowance of homestead here, and that is based on the fact that the bankrupt had sold his homestead. The real facts about this are rather difficult to ascertain, but it seems to me that, while the bankrupt did transfer his exemption to another party, it was transferred back to him, and he now has it, and will receive it if his exemption is approved. Of course, if it could be fairly gathered from this evidence, or if there was a reasonably necessary inference that he was trying to prefer one creditor over another, it ought to defeat the exemption; but it does not so appear.

I do not think a case is made here, in which I am justified, or would be justified, in differing with the referee about the conclusion reached by him. Consequently the report of the referee must be confirmed, and judgment rendered that the bankrupt is entitled to have his exemption; and it is so ordered.